Appeal 1296 from 2007. Mr. Perry, welcome to the Court. Good afternoon to you. I understand you're reserving 5 minutes for rebuttal, so when the yellow light appears, you're starting to consume your 5 minutes. Clear enough? Thank you, Your Honor. Please proceed. Mr. Chief Judge, and may it please the Court, the Supreme Court held in the Microsoft case that Section 271F requires that the very components supplied from the United States be combined abroad to form the patented invention of that issue. The Supreme Court didn't decide the question, apparently, before. They reserved it. They reserved the precise question before it, although I would submit, Your Honor, that they went a long way towards answering the question by requiring and stressing the statutory prerequisites of combination and supply. The method claim in this case, Your Honors, and most method claims, in fact all method claims that the parties have brought to the attention of the Court, do not have components that can be both supplied and combined. The claim in this case, for example, method claim 4 of the 288 patent, what St. Jude supplied from the United States, the ICD devices, these little machines that get implanted to shock the heart, Your Honors, are not components of the patented method. But, Mr. Perry, I know you dismissed Quanta, the Supreme Court's discussion in Quanta about the closeness between method claims and others because that was an exhaustion case. But at the beginning of the opinion, Justice Thomas, in discussing the method claim at issue in this case, talks about whether exhaustion applies to the seal of components of a patented system that must be combined with additional components in order to practice the patented methods. Doesn't that sound like a lot like 271F? Your Honor, we don't dispute that methods may have components. It is that the component of a method is a step or an act. It is not a device, apparatus, or machine or material. That is the distinction. When the Supreme Court in Quanta had that discussion, it was en route to holding that the particular machine, the particular product there, was capable of only one use, and that is to practice the method. The St. Jude devices, that is not true, Your Honor. So, counsel, is your position that 271F doesn't apply to methods or that it applies to methods but not in this case? Your Honor, it is our position that 271F certainly does not and cannot apply to this method claim. It does not apply to any method claim that has ever been in a case before this court. Whether there is some... You've looked at all of them, have you? Your Honor, method claims involving 271F before this court, we have, and they're in the briefs. There aren't very many of them.  Whether there may be some possible hypothetical case, first, no party, no amicus has brought such a case to this court. It is the nature of method claims we would submit that it is difficult for them to meet the statutory prerequisites to 271F because of those limitation languages supply and combine. More importantly, there's no reason to stretch the statute to reach a method claim. The Supreme Court in Microsoft, if it did nothing else, it clearly and expressly and unequivocally rejected a, quote, dynamic interpretation of 271F. CPI in this case clearly is asking for a dynamic, expansive, broad definition of 271F. And what the Supreme Court said is unless the statute clearly speaks to this conduct, because we're dealing with an area involving the sovereignty of nations and the different policy choices that may be made abroad, we are not going to stretch this particular statute to reach conduct or products, or in this case methods, if it's not clearly required. So, Judge Moore, to directly answer your question, I don't know of a method claim that is within 271F. But certainly this method claim is not within 271F. Discuss with me a hypothetical pattern somewhat after the Union Carbide case. What if you had as one component of a method the mixing in of a catalyst? And the catalyst is a non-staple. Its only use is in this chemical method. And that is what is supplied from the United States abroad. It's made here. It's the critical component. It's the catalyst that makes the chemical method work. Would that be supplying a component of a method, particularly when it only has an infringing use? No, Judge Rader. Why not? A component, a material, an apparatus, a product, a device, a physical thing, cannot be combined with the intangible steps or acts of a method. It's the only thing it can be used for. That's the whole hypothetical. It's the only use is to be combined in this particular method. It doesn't change my answer, Your Honor. There is no way in the universe to combine a composition or a material or a catalyst with a step or an act. One cannot combine. No, you're missing the point. It is a catalyst. A catalyst only has the use of being mixed with other things to produce a reaction. Your Honor. And the chemical industry, as you know, relies primarily on process claims. And as a part of those process claims, you very often will find a catalyst, and those catalysts may be non-staple. Why doesn't that fit very precisely into supplying the critical component of the chemical process to facilitate the method? Your Honor, the catalyst is used for the method. That's the language the Court used in Union Carbide. That's the language CPI uses in this case. It clearly is necessary for the method. It facilitates the method. The Supreme Court and Microsoft again held that the sprocket machine that may be necessary to make the device work, if it has a sprocket as an input, facilitating a method is not the same as being a component of a method. In other words, the language of 271C helps you. Absolutely, Your Honor. I was well familiar with the formulation in 271C that distinguished between components and products on the one hand, and apparatus for use in practicing a method on the other hand. And that for use in language, which does appear in the Union Carbide opinion, does not appear in 271F. It has been inserted by CPI here, but the word use actually does not appear anywhere in 271F. In other words, a component of a process is always a step, no matter what had been done to the material used in it earlier. The only statutory component of a process is a step or an act. There may be products or materials necessary to be used in that process, but they are not components of that process. How do you dispose of the theories of inducing infringement, maybe contributory, but more likely inducement? Your Honor, the inducement piece of this statute, which is the F1 piece, requires the combination, the export of all the components that are then combined over C. Certainly in this case, there is no combination that takes place. St. Jude exports this device that a physician uses to practice the method. There is no combination. The inducement element of the 271F claim requires that combination. There is no combination in this case. There is nothing in the inducement law which requires a combination. It's a very broad law, and it's intended to accommodate situations where there isn't direct infringement, where the statute isn't infringed. The infringing act still must be identified and specified. In the case of this method claim, in fact all method claims, the infringing act is going to be the carrying out of the steps of method in another country so that the act of infringement is overseas. Then the question is under 271F, is there some United States conduct that can be attached for liability to be imposed? And what the Supreme Court said, again, in Microsoft, is it is not enough that there is conduct in the United States that facilitates the overseas practice of an infringement, but rather the infringing act itself must take place in the United States. And what CPI has failed to point out in this case, either under an inducement theory or under a contributory infringement theory, is any act in the United States that involves a component that can meet the statutory prerequisites of being both supplied and combined. Mr. Murray, would 271F apply in a hypothetical situation where you had, say, a six-step method and the first three steps were performed in the United States and then whatever article was being processed was then shipped overseas and the last three steps were finished abroad? Would that be supplying in or from the United States all or a substantial portion of the components, components being steps of a patented method? To answer your question directly, Judge Lynn, if it's three out of six, even if those three in the United States could be considered exported, carry along with whatever was transferred, I would submit that three out of six is not all or substantially all. I think all or substantially all means what it says, all or substantially all. Well, let's say five out of six. Or 99 out of 100. You knew you were going to get that reaction. Your Honor, I think that hypothetical still has the difficulty that nothing that is a combinable component is being exported. You can practice one step here and one step in Canada or Europe or Japan, but there is nothing going across the border. So in other words, the result of the first three or five steps is different from exporting the steps themselves? Absolutely, Your Honor. A method claimed result would be the data or other information they produced in the context of this statute, or this patent, for example. The first step is the determining step. Practicing that step would result in data. What is the condition of the heart? You could export those results, but the statute doesn't speak to results. The amicus ormco makes that position, but if Congress had wanted to reach results, it could have. What Congress spoke to was the components of the method. And I would like to stress CPI's concession in this case, at page 16 of their supplemental brief, that steps or acts cannot be supplied. The parties are in agreement on that. I understand that their concession doesn't bind this Court, but there is nobody before this Court arguing that a step can be exported, which is why CPI has gone to the device being exported. And to return to your hypothetical, Judge Lynn, that starts to look a lot like the Pellegrini case, where the results of a step generally will be data or information, and transmitting those overseas, even if those data are used in the further practice of an invention, that is not a component within 271F, and that's the square holding of Pellegrini. And the Supreme Court, of course, cited Pellegrini with approval on that point as to the transmission of data not being a component within the meaning of 271F. Mr. Perry, is it clear whether this device you display to us can be used to practice some other method not covered by the patent in this case? Absolutely, Your Honor. The summary judgment record is undisputed that the device shocks the heart. It is a pacemaker cardioverter. The evidence in the summary judgment record we cited in our brief, it's appendix page 5998 and 6554 of the two declarations from a doctor and from a nurse, who testify that the devices are shipped from the factory turned off. They must be programmed. The majority of them are programmed to perform functions that do not infringe. This method claim is very, very narrow. Even those that are programmed to be capable of practicing the method, the majority of those do not actually execute the method by reaching that final step of executing the cardioverting function, so that it's a very, very small number. The summary judgment record says the majority of the evidence we've developed to date is not in the record, and I'll tell you it's not in the record. I can tell you it's much less than 50% of the actual operation of these devices does not practice the method. Now, that programming is done in the United States, is it not? No, Judge Newman. The device is shipped in an off state with all the settings to default, and in that state it is not capable of practicing the method. It has to be programmed. They're all set in default with instructions as to how to program for the particular use? There's a separate machine, which is the programmer, which is a special purpose computer that the device gets plugged into, and the company provides instructions for how to program the device in many, many ways, a very small number of which are capable ultimately after implantation in a patient of executing the claimed method. So the actual programming, though, takes place by a physician, typically in the operating room. So your position is that even those that are programmed to perform the method that's patented in the United States are not infringing? The device is not infringing, and that is the jury verdict in this case that was not appealed. That claim was litigated and is over. They have a product claim in this case, claim 13. Our devices do not infringe the product claim. They do not use necessary structure, the PDF circuitry claimed in the patent that is an element of the product claim. The reason that the method claim is even here at all, ironically, is that CPI argued previously for a differential interpretation of the method claim and the product claim. They said the method claim was not subject to 112 paragraph 6, even though the product claim is, and therefore didn't pick up the PDF circuitry limitation. That's the only reason anything is left in this case, because CPI insisted, and this court in a previous opinion held, that there is a difference between product and method claims. Now they come to court and say, no, there is no difference. Well, if there's no difference, we ought to have no case at all because they should be bound by the structure recited in the specification. But to directly answer your question, Your Honor, the product claim has not been infringed. There's a judgment to that effect. It was not appealed to this court. There is no apparatus claim in this case. When you were talking about inducement earlier, presumably inducement would be dealt under 271B and contributory under C, and what we're dealing with is a specific F, which goes back to Deep South. Correct. That's true. In 271F, Congress borrowed from, although it did not exactly duplicate, the concepts from B into F1 and the concepts from C into F2. We do not have an F2 case here because the device is capable of substantial non-infringing uses. We would submit we don't have an F1 case either. F1 only applies if you export all or substantially all of the components. CPI has only identified one thing. I don't know how one thing can be all when there are multiple steps not performed in the United States, but that's a separate point. And the Supreme Court told us not to extend 271F extraterritorially. That's correct, Your Honor. The presumption applies strongly in these circumstances for a very good reason. Other countries have made different policy decisions about the patentability of method claims, including medical treatment methods. We have submitted in this case, and CPI doesn't dispute, that in Europe, in France and Germany, this method claim is not patented. CPI does not have a patent on this method. So their claim in this case is that when we ship the device overseas and a French physician decides to program it in a particular way and implant it in a patient in a way that the French people, the French government have decided is not patentable as a matter of public policy because, in the view of the Europeans, medical treatment methods should be available to all and not subject to the patent laws, their claim in this case is that that creates U.S. infringement liability for an act that not only is not unlawful overseas, but is affirmatively lawful under the European Patent Convention. That is the kind of conflict of sovereign laws that the Supreme Court in Microsoft reiterated, but it goes back to the old cases of Brown v. Duquesne and the other cases involving, you know, Brown v. Duquesne was the French sloop, the schooner that came into Boston Harbor. You know, here we have more French people involved. We don't want to offend the French in these circumstances. And, you know, that lesson of Microsoft. The other lesson of Microsoft that is part of the presumption is the clarity required of Congress. CPI concedes in this case that the language of the statute is a poor fit for method claims. A poor fit. Well, a poor fit, Your Honor, is not sufficiently clear to overcome the presumption against extraterritoriality. Do keep on picking up this cardio for it. I hope it's not the personal stimulation. Judge, my argument. Mr. Perry, the Deep South case was decided by the Supreme Court, and 271F was a reaction to it by Congress. Is there any legislative history that you were able to find that would apply 271F when it was adopted to cover method or process claims? There is zero legislative history, Your Honor, applying it to method claims. There is scads of legislative history that says product, product, product. President Reagan, when he signed this bill, for example, said, quote, it closes a loophole in existing law which permitted copiers to export jobs and avoid liability by arranging for final assembly of patented machines to occur offshore. And there is absolutely no reference to method. CPI has found one isolated statement to methods in a statement that former Commissioner Banner made. I read it about 19 times, Your Honor. I think it's a typo. I think he meant product and he said process. But even if it's not a typo, it's not in the official history. It's not recited by any member of Congress. It's an industry commenter and published. No member of Congress has ever suggested it applies to trade reports. The parties collectively have exhaustively gone through the legislative history, every iteration of the statute. There is not one suggestion. And that was confirmed, by the way, Your Honors, with 271G. When 271F was introduced in 1982 and then 1983 and 1984, it was twinned with 271G. 271G and 271F were constantly referred to in the debates, 271F as the product clause, 271G as the process clause. They got split apart because 271G proved, in the 1984 Congress, to be too controversial. CPI says that in their brief. Why was it controversial? Well, the Florida base revealed that the controversiality was the application of U.S. patent law to processes practiced overseas. The very controversy was the question in this case. If 271F means what CPI now says it means, then it would have been a hugely controversial statute. It would have been pulled from the Senate debates or something else. It was passed because everyone thought it was a product case. The process clause was then passed four years later, 1988, as 271G. It applies only on the reimportation of a product that results from a process. And Congress, during the Florida debates, several times made a very important and revealing comment that Mr. Neustadt has never responded to. The Congress, in enacting 271G, said the overseas practice of a patented process does not violate any of the U.S. patent laws. This is after 271F was enacted, Your Honors. What Congress said is the inventor's recourse in those circumstances is to go to the other country and obtain a patent over the method there and enforce it there. Of course, the problem was at that time that generic drug manufacturers were manufacturing in countries where there weren't product patents and importing into the United States. And that's the genesis of G. Well, Your Honor, that is in part true. But at that time, I believe, the TRIPS agreement had also been signed and the regularization of the patent laws was in place. And as the Court went through in great detail in the NTP case, for example, the structure with which Congress was dealing then, the multilateral nature of these kinds of patent protections, require a calibration, again, between our sovereign interests and the sovereign interests of our trading partners. And the way Congress solved that problem in the specific context of process patents was not in illegalizing the practice of the process in France, but only reaching it if that process resulted in a product that was imported. In this case, it's absolutely undisputed. There is no product that results from this method and no product that's imported in the United States. So, again, if 271F means what CPI says it means, 271G would not be meaningless, but it would be largely deprived of its force. It would have been largely unnecessary because, in many cases, the domestic inventors could simply reach the actual overseas practice. Are you suggesting that should we adopt the interpretation of your opponent, that interpretation would be somehow inconsistent with or conflict with or violate the TRIPS agreement? Your Honor, our position is the TRIPS agreement, in setting a floor among nations for patent protection, specifically authorizes the nations to make different decisions regarding the enforceability of method patents. And medical treatment patents are specifically called out in TRIPS. That sovereign decision has been exercised in the real world by the United States, for example, taking a relatively patent-friendly approach to method patents and medical treatment methods, and the Europeans generally saying that medical treatments are not patentable. That is permissible under TRIPS, and the TRIPS allows that. If the court were to interpret 271F to reach this type of conduct so that U.S. law would effectively make unlawful that French doctor's decision to program a device and implant it in a French patient in conformity with French law, it would at least put a strain on the TRIPS framework, and not just TRIPS, the overall multilateral framework within which we are operating. And again, the Supreme Court of Microsoft reminded all courts and litigants that we should not adopt an expansive reading of the statute if there's an alternative available that's equally faithful to the statute. I take that answer to boil down to no, not a treaty violation. Is that a fair assessment of what you just said? Your Honor, we are not suggesting that it is a treaty violation. We are suggesting that it would unnecessarily put a strain on the sovereign relations of the United States with our trading partners. And isn't G an import provision, whereas F is an export provision? Absolutely, Your Honor. And your point about G is that when they wanted to talk about process patents, they did it in precise language. They did it in precise language, and they did it in a way that makes clear that F is, again, a product provision and limited to products. These are ultimately, you know, there are obviously debatable issues here. Union Carbide stands for that, if nothing else. But I would leave the court before I sit down and reserve my time for rebuttal with the thought that the Supreme Court of Microsoft also held that last section of Microsoft, the court specifically said, good points have been made on both sides. We could go either way, but because of the presumption against extraterritoriality, the tie goes to the runner. The tie goes to the accused infringer in this context because of the impact on foreign conduct. In this case, Your Honor, the other side hasn't pointed out something so clear that this court should invade the prerogatives of sovereign nations and read a statute in an expansive way against the Supreme Court's warnings. Thank you. Thank you. Mr. Neustadt. Good afternoon to you. Welcome back to the court. Thank you very much, Your Honor. Please proceed. We have before us an issue of statutory construction. What did Congress mean when it passed 271F? Now, to answer this question, we look at two fundamental things. We look at the purpose of the statute, and we look at the language that was used to accomplish this purpose. Don't you have it in reverse order? They can be either way. I think you could do it that way. You could do it the other way. And I can go both ways. The question is how we go. That is true. The purpose is the really simple answer. There hasn't been any dispute that the purpose was to overrule Deep South. What they wanted to do in overruling Deep South was to give the patentee more protection. What they found was that someone would do almost everything in the United States, and he would save one last thing to be done, put it in a box, send it abroad, and say, I have not infringed. And what the Congress wanted to do was they wanted to prevent that from happening. And they wanted to prevent that from happening not only in the case, Deep South, that came up before them, which was a machine for deveining shrimp, but they wanted to do that with respect to every invention. Including methods? Pardon me? Including methods? Yes. Where in the legislative history do you find that methods or processes will be covered? We cited one minor instance that Mr. Perry referred to. Which he referred to as a typo. He referred to it as a typo. I wanted to answer your question correctly. The real answer to your question is it's directly in the statute. The statute talks about patented invention. Well, it talks about components of a patented invention. Components of a patented invention. So how do we define components? Is that the issue? No. First you have to look at patented invention. If you see the word patented invention and you say to yourself, what is the scope of this statute? What does it apply to? Well, it applies to components of a patented invention. And looking at patented invention, you look for a definition in Title 35. But not the components of a patented process, the steps. No, I fundamentally disagree with that. And I will get to that in a moment. I'm not surprised at your answer. Thank you. Patented invention, you go to Title 35 and you look at Section 101. And Section 101 is entitled, Section 101, I'll get it for you, is titled Inventions Patentable. And it lists four statutory classes of invention. Process, machine, manufacturer, or composition of matter. So if you're looking at patented invention, Mr. Perry would agree with you that a process can be a patented invention. Certainly. How can a machine be a component of a process? How can a machine be a component of a process as opposed to a step in the process being a component? Very easily. When Congress passed this statute, as I said, what they wanted to do was to give more protection to the U.S. patentee. They didn't want the, in effect, evasion of infringement by putting all things in the box and not connecting them. When it used the term components, no matter what, it was referring to constituent parts. It was saying, you're putting in that box whatever is necessary to perform the invention. And you're avoiding having an infringement ruling in this case through subterfuge. And we want to protect against it. So components doesn't mean elements of a claim. But why, if your statement is accurate, wouldn't they have said a substantial portion of the components of a patented invention are a material for use in practicing a patented process like they did in C? They could have done that if they wanted to. They just didn't feel it was necessary here. C was a statute in which they broke them apart. If they chose to break them apart the way they did in C, then they would have had, and they would say for each class of invention, you can't do it. They wanted to give us work to do. I don't know. Keep in mind that C and F were 32 years apart. You had different drafters. And basically they thought components with respect to patented process was okay. And that's why we cited the Banner Statement. Namely, that they could see that in the record, whether it was a typo or not, they could see it in a record that a former commissioner of patents used components along with process and seemingly didn't think that there was any problem with it. He didn't think they were a poor fit. By the way, we did not say in our brief that it was a poor fit. All that we said was that components was a better fit with machine and a lesser fit with process, but not that it was a poor fit. But in 271G they know how to use the term process. Well, 271G... So why couldn't they use the term process in 271F if they wanted coverage? Well, in 271G, they were directing themselves only to the process. When you use only the language of a process, you don't have to use the catch-all term that they used in 271F. They wanted to have a statute which says that with respect to all classes of invention, you can't just put things in a box and avoid infringement.  since you've done everything here. And this also is directed to the arguments of extraterritoriality. 271F was not meant to capture stuff done abroad. 271F was to charge the person who did a lot of stuff, almost everything in the US, charge him with infringing a patent. 271F has no recognition at all that, aha, once the device goes overseas, now we have infringement. In fact, if you look at the language of F1 and F2, it does not talk about infringement abroad. It talks about actively inducing in the United States. Your problem is that the Microsoft case did apply the presumption against extraterritoriality in a very similar situation. Let's get to Microsoft then. Microsoft is a blueprint case. Microsoft had nothing at all to do with... Pellegrini was a blueprint case. Pardon me? Pellegrini was a blueprint case. Microsoft was a code case. And whether it was sent electronically or on a disk, it was a code case. The similarity between Pellegrini and Microsoft, which I submit is a blueprint case, in both of those cases, you didn't send the important component. In Microsoft, the computer program that was necessary to run the PC wasn't enclosed. It didn't come in the package. In Microsoft, what they... The Supreme Court said that sending something from the United States abroad doesn't mean that the presumption against extraterritoriality can't apply if the combination or the performance of the process or whatever it happens to be is done abroad. We still have to be concerned  don't we? Microsoft was an extraterritoriality case, in that the component was being made abroad. You were not shipping the component from the U.S. in Microsoft. What Microsoft said, and they specifically reserved the issue before the court, I think as Judge Lori pointed out before, what Microsoft said is you did not send in your package the computer program necessary to send the PC. All that you sent was this master disk. Now it's true that you can take the master disk and make the program. And they said, that is just similar to a blueprint. You sent a blueprint telling me how to make the component. In order for 271F to be applicable, don't send the blueprint, send the component. And in Microsoft, the Supreme Court says, I am drawing the line right here. And when the Supreme Court said, as Mr. Perry referred, that their arguments go both ways, they said, I am drawing the line right here because you did not give me the component. That is not the issue in this case. In this case, all the components go abroad. If you were to ask... On that point, what is sent abroad is a device that can have non-infringing uses, right? It can be programmed in ways that would not infringe. Indeed, you heard Mr. Perry say that most of the time it is. How does that affect these cases? It is very different from the union carbide situation where what is supplied has nothing but infringing purposes. Here, it has non-infringing uses. It really only affects the quantum of damages. And I don't think it is really included in the court's question. But that is how it would come up in the quantum of damages. In other words, how many of them, actually, as Mr. Perry says and as the district court says, how many of them actually end up in a patient where they are then activated to save that patient's life? So I think the answer to your question is it only pertains to the quantum of damages. And there was testimony in this case that... But have they supplied a component at all if it is not infringing? Well, it does infringe in many cases. Otherwise, why put it in people? Sometimes it can infringe in people and sometimes it can't. Depending upon how it is programmed. Mr. Perry's client has done studies and they find in a certain percentage of these you will find this device being actuated and will perform the method. So the way the record was below, a certain percentage of these will actually go through and do that method. How fair is it to charge the U.S. exporter with infringing a patent simply because the device they export is capable, if it is programmed a certain way, of meeting the steps of the method? Well, the testimony in this case was that you couldn't sell one of these devices unless it had the capability of being programmed to do this. Because not only is it programmed when it is first put in the patient, the doctor has to have the capability of programming this at the patient's health so it should change. So the testimony, there was no dispute, was that you couldn't sell one of these unless it had this capability because no doctor would put it in. When you say this capability, do you mean to shock the heart or to infringe the method? To run the method. That's certainly not what Mr. Perry said, if I understood him correctly. He said it was quite capable of functioning as a heart stimulator according to methods that did not meet the steps and therefore did not infringe your method claim. He said that, but some of them run the method, others do not run the method. And as I say, his client has done a study on that. So it depends on the programming done, let's say, in France. So I go back to my question. How fair is it to impose liability on the exporter here in the U.S. of a device they've made simply because if it's programmed in a certain way, it would infringe  when it's programmed in various other ways it won't infringe? Well, as Mr. Perry would tell you, according to the district court's decision, he's only charged with infringement for the devices that actually do that. Is the answer to your question that the panel decided that issue, which is not before the in-bank court? Am I wrong? Yes, that's correct. That's correct, Your Honor. So I was saying that the 271F talk about a patented invention. If you have any other doubts concerning what is the scope of 271F, you go to the Supreme Court decision and Lillie v. Medtronic having to do    the one having to do with drugs, and there the Supreme Court said, and Lillie, the Supreme Court said, if you have any other doubts concerning the phrase patented invention with respect to 271E1 is defined to include all inventions. So you're fighting the actual language of the  which tells you you are dealing with something the statute says this covers all inventions. Mr. Instead, why isn't this close to the Microsoft case where the disk goes abroad and it's programmed abroad so the component wasn't really programmed abroad. Here it's not programmed until it's abroad. Why isn't that similar to the Microsoft distinction about being supplied? Because in Microsoft, you use the master disk. You then use the master disk to create the program. Then you use the program. In Microsoft, according to the Supreme Court, you send the program. And that one step was the critical difference in Microsoft. In our case, we don't send a master disk. We send the actual program. The actual program would have sufficed in Microsoft, but they didn't send it, so that's why they lost. And that's why I think it's very well settled that the sale in the United States of an apparatus  perform a patented process doesn't infringe a process. Are you suggesting that 271F would make that same conduct and infringement simply because the sale of the apparatus is from the United States to a foreign country instead of to someone in the United States? Well, that question has never come up, but if you read 271F 1 and 2, they do not talk about the act being done abroad. They talk about the infringer in the United States. Well, I'm talking about the sale of the apparatus for performing the process and the sale being made from the United States in both cases. In one case, to a United States customer, that generally would not be recognized as an infringement of a method patent. And the other case would be the sale of that same apparatus from the United States to a foreign customer. Are you talking about the combination being made abroad as being the act of infringement? They say the act of infringement is the infringer in the United States putting this all together with the intent that they be combined overseas. So all that happens in the United States. You say that because this device is programmed abroad, the fact that the device is supplied is sufficient to have infringement, right? We supply the device and the program. If you read, what then if I'm Dell or IBM and I'm supplying just general purpose computers, now those can be programmed abroad to infringe countless processes that are claimed here in the United States. Every software patent could probably then be infringed by that machine. Have I infringed all of those? Of course not. The answer is that you don't even have to answer that. But it does show that your argument really only makes sense if the article supplied from the United States is a non-staple. It can only be used in the infringing process. That's its only use, which yours doesn't. How do you deal with that? The answer is that pertains to quantum of damages. That's why I gave my hypothetical was to respond to your quantum of damages point. It really doesn't, because my general purpose computer, under your theory, would infringe countless unknown processes. Every software patent that could be put on that computer would infringe. Now you're not going to say that's 271F, are you? So the point is 271F really has to be limited to non-staple components that are only infringing. Then how do you fit in there? Because yours can perform infringing or non-infringing. Therefore, it's a staple, not a non-staple. That's what was done in this case. It related to quantum of damages. We're not talking about quantum of damages now, because I dispose of that with my general purpose computer. Let me give you the answer to your question. In my general purpose computer, it will clearly infringe methods. I just don't know which until it's programmed. So every time Dell exports a computer, it is guilty of infringing 271F, and we'll decide later the quantum. That can't be right. The only way to say that the record could be developed due to these products was that they determined that this method is done with 10% of those devices, and they only deal with those 10% of the devices. So it's a given that you're talking about the method being done abroad. And by saying it's only 10%, you've gotten rid of the 90%, it didn't perform that method. Yeah, but is your contention here that this device is specially made or adapted for use with the process? Sure. They send the program over and tell you how to do it and how to set it up and how to use that process. But that's why it doesn't  Is there any answer to Judge Rader's question about the staple situation, the general purpose computer? It wouldn't be specially made or adapted? This is not a staple, certainly. It is specially made and adapted. Yeah, that's the point. Yeah. Well, it fits it, but it doesn't mean it doesn't also fit F1. Now, the court has discussed the difference between methods and machines, apparatus. They also got in terms of product and apparatus. And there seems to be, I think, from the dissent in Union Oil, the statement that methods and products are very much different. But the Supreme Court in Quanta said these are not different. These are just ways of claiming the same thing. Wasn't the Supreme Court dealing with an exhaustion issue, which is quite different from interpreting this particular statute? No. The Supreme Court, in order to find that method claims are also subject to exhaustion  the Supreme Court said, but process claims are no different. You can take a particular product and claim it in process terms. In other words, if a product has been sold, which has been made by a patent process, we will consider that to have been exhausted. No, Your Honor. What they said in Quanta was apparatus and method claims may approach each other so nearly that it would be difficult to distinguish the process from the function of the apparatus. In an exhaustion context. No, not in an exhaustion context, because in order to reach the conclusion that there was patent exhaustion, they specifically had to find that the method claim and the product claim claimed exactly the same thing. Let me give you an example. In Deep South, you had a de-veining machine. You could claim a de-veining machine, a de-veining machine comprising means for doing A, means for doing B, means for doing C. You could also have that same machine covered by a process claim which says a  de-veining. Do step A, do step B, do step C. That's because of all the means clauses. Pardon me? That's because of all the means clauses. You can do it even with actual elements, because often claims talk about specific elements without using means plus function. So what happens? Basically, in order to claim an invention, especially for a machine, you have to say how the machine operates. That's where the invention is. The invention is not just an assembly of parts. A claim says a de-veining machine in which you have a trowel for doing this, in which you have knives for doing this. But you can claim that. This is straight from quanta as a process. So you can claim exactly the same thing. And there is no real distinction between method and process. Now, you don't have them always claiming exactly the same thing, but the Supreme Court says sometimes the method just really describes what the machine does. And in effect, they're claiming exactly the same thing. And that's how they reached the conclusion that there was patent exhaustion with respect to a method claim, just as it is with respect to a product claim. Counsel, returning to the very first question I think that Judge Lurie asked you, why isn't a component of a patented process a step? Because Congress, when it enacted the statute, used component with the understanding that component is what enables you to make the invention. Congress wasn't concerned with elements in a claim. Congress was concerned with putting something in a box, sending it overseas, and avoiding infringement here, whereas almost everything has been done here. Congress was concerned with what you put in the box. Congress was concerned with the machine that you have that performs the method. Then how do you get around the decision that Congress in 271C would not say or a component of a patented process, but rather feel the need to say or material or apparatus for use in practicing a patented process? It seems to me that this is your most difficult hurdle. I still don't think I fully appreciate how you answered that question earlier. Let me try to explain it again. Where you have four statutory classes of invention, we have process, machine,  composition of matter. If you want to use an adverb with respect to machine, maybe you use components. If you want to use an adverb, a constituent adjective with composition of matter, maybe you'll say components, maybe you'll say something else. If you want to use process, maybe you'll use the language in 271C. But what 271C did was it broke apart those four statutory classes of invention, and then it had to find an adjective for each one of them. And in 271C, they used components for the adjectives for everything except process. For process, they picked up a different adjective. They said material or apparatus, primarily what I'm saying here. Isn't that because the word component would have applied to steps and they wanted to ensure that they captured the machine that was used in the process? No, I think the reason they did that was they decided to break the classes apart. Once they broke the classes apart, it then became necessary to find a separate adjective for each class. In 271F, they did not break them apart. In 271F, they wanted to use a catch-all phrase, and so they used the catch-all phrase, and that's perfectly appropriate. In other sections of the     catch-all phrase, and that's perfectly appropriate. I think that the use of patented invention implies that they meant component would be a machine even when normally the steps of a process would be thought to be the component. Well, the steps wouldn't be the component because if you want to practice a process abroad, you don't need someone sending you steps. You need someone sending you the machine. You need someone sending you the ICD. Congress is worried about someone doing something abroad on the basis of an invention in the process. Congress is going to enable someone to in effect use that invention. And when you're talking about a process invention, what you're talking about is the machine or the ICD that does the process. Congress was very pragmatic. Congress wasn't doing patent attorney analysis of what is a process. They were saying it's infringement if you send that ICD over there. It doesn't do you any good to send stuff abroad which doesn't result in the invention. You can't send steps over, but a process claim talks about a process being performed. If you want to do that and you're abroad, send me the steps that you're talking about. And    pragmatic  that. When you're talking about a process being performed, Congress was very pragmatic about that. And Congress was very pragmatic about that. If they make an invention here and then bring it into the U.S., they're going to get charged with infringement. They're going to get charged with infringement for using a process because of 271G and then they'll get charged with infringement. So I don't think it makes any effect. Why wouldn't the effect be that the U.S. maker wouldn't make it here anymore, they'd make it overseas to escape the liability you want to visit on. But they would then have to restrict all their sales to abroad. Because if they want to bring that back into the U.S., then they're going to get hit with infringement. Or they make all their foreign products abroad and all their U.S. products in the United States. They could do that. They're a multinational corporation, so they have many plants, that's a possibility. Wouldn't the net cost of manufacturing here seem like there would have to be fewer jobs here? Well, I don't know why they would manufacture here to sell abroad. No, no, no. They did manufacture abroad for all their foreign sales and manufacture here only for their U.S. sales. Whereas now they manufacture for overseas and domestic sales here. Therefore, the quantum manufacturer under your sense of liability would have to go down. Otherwise, they'd be trying to lose money. Okay. The 271F really doesn't affect foreign law. What 271F deals with is what you do in the U.S. They're holding these people responsible for what they do in the U.S., not what happens abroad. What they're saying is you've done almost everything here and nothing done abroad. That's why they have  go down the road of colonizing active infringement abroad. That's why the statute makes sense. Time has expired, but Judge Newman had a question, so she gets the last word. Well, thank you, because I did want to pursue one of the policy-related issues that you mentioned when you mentioned the Eli Lilly Medtronic case, where the Supreme Court said that even though the statute didn't include medical devices, it should have, and therefore held that it did in that case. Is this what you're really asking us to do? I think we all agree that the literal case with Deep South controlling the statutory enactment makes it difficult. Are you asking us, in fact, to fill this legislative gap ourselves? I think this is a much easier case than Eli Lilly. There is no gap here, because here you're referring to patented inventions. There they had a problem. The statute referred to drugs, and it didn't refer to devices. So I think this is a much easier case, and there is no gap. All right. Thank you. Thank you. Mr. Perry, you have 14 minutes and a little more. Thank you, Your Honor. Judge Rader, your example of the general purpose computer is a good one. These little devices are special purpose computers. They can be programmed in many different ways, and you heard Mr. Neustadt acknowledge only about 10% of the time do they practice this particular method. Is there a good policy reason for excluding this sort of thing from the        a good policy reason for that. I don't think there's a good policy reason for that. I don't think           there's a good policy reason for that. I don't think there's a good policy reason for that. Where if it practices this method, Mr. Neustadt would like to impose liability under U.S. law. That is a direct affront to the sovereignty of France. The U.S. maker would be liable only for selling a device lawful here. This is a direct offense. Putting two lawful acts together and making them an unlawful act. The sale of the device is lawful here. The practice of the method is lawful there. The Congress surely never contemplated making two      devices  here. Thank you. The Honorable Court is adjourned until Monday morning at 10 a.m. Thank you.